**Thomas R. HELM and Lisa Helm, Individually and on behalf of Minor Children, Diana Hera Helm, Christina Elaine Helm, and Sarah Marie Helm, Appellants,**

v.

**J. Thomas SWAN, M.D., Delbert L. Chumley, M.D., Gastroenterology Consultants of San Antonio, P.C., and Methodist Healthcare System of San Antonio, Ltd., Appellees.**

No. 04–00–00365–CV.

Court of Appeals of Texas,
San Antonio.

June 27, 2001.

494

Chris Cessac, Jay K. Gray, J. Mark Sudderth, Noteboom and Gray, Hurst, for Appellant.

Bertina Buran York, Strasburger & Price, L.L.P., Harold J. Lotz, Jr., Lotz & Associates, P.C., Edward C. Mainz, Jr., Thornton, Summers, Biechlin, Dunham & Brown, L.C., San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, and CATHERINE STONE, Justice.

## OPINION

PHIL HARDBERGER, Chief Justice.

Thomas R. Helm and Lisa Helm, individually and on behalf of minor children Diana Hera Helm, Christina Elaine Helm, and Sarah Marie Helm, (the "Helms") appeal the summary judgments granted by the trial court after the trial court granted the appellees' motions to exclude the testimony of the Helms's expert witnesses. The Helms present two issues contending that the trial court erred in excluding their expert witnesses and in granting the motions for summary judgment. We overrule the Helms's issues and affirm the trial court's judgments.

### BACKGROUND

The Helms brought a medical malpractice action against J. Thomas Swan, M.D. ("Swan"), Delbert L. Chumley, M.D. ("Chumley"), Gastroenterology Consultants of San Antonio, P.A. (the "Association"), and Methodist Healthcare System of San Antonio, Ltd. ("Methodist") for damages caused by the pancreatitis Thomas Helm developed after undergoing an endoscopic retrograde cholangiopancreatography ("ERCP") with sphincter of Oddi manometry and sphincterotomy. The only live claims at the time of the summary judgment hearing were against Swan for negligence, against the Association for vicarious liability based on Swan's negligence, and against Methodist for the negligence of its nurses.

On May 12, 1995, Chumley performed the ERCP with sphincter of Oddi manometry and sphincterotomy on Thomas. The Helms have not alleged any complaints with regard to the performance of the operation. Around 12:30 p.m., Thomas was admitted to the hospital for observation. Chumley left orders for Thomas's diet to be advanced as tolerated, Thomas was to receive oral pain medication (Darvocet) and medication for nausea (Phenergan) as needed, and his vital signs were to be taken.

Around 2:30 p.m., Thomas ate two trays of food and vomitted. The nurses administered the Darvocet and Phenergan. At 5:00 p.m., the nurses phoned Swan, who was on call for Chumley, and informed him that Thomas was continuing to have pain and nausea despite the medicines they had administered. Swan prescribed a stronger pain medicine (Demerol) and Phenergan to be given every four to six hours as needed. Swan believed that Thomas had overeaten and his pain was due to the insertion of gas into his stomach as part of the ERCP procedure.

In accordance with the orders, the nurses administered the Demerol at 5:00 p.m. and 8:45 p.m. At 9:27 p.m., Thomas complained of abdominal pain. At 11:10 p.m., the nurses noted that Thomas was sleeping. At midnight, Thomas complained of pain and vomitted. He was given both the Demerol and the Phenergan. At 1:00 a.m., the nurses noted that Thomas was sleeping "with apparent relief." At 2:00 a.m., Thomas walked to the nurses station complaining of pain. Because the nurses could not give him an additional dose of Demerol, they gave him two Darvocet tablets. At 4:00 a.m., Thomas was given the Demerol. At 5:39 a.m., the nurses noted that Thomas was sleeping. At 8:00 a.m., the nurses noted that Thomas was still in pain. Swan ordered laboratory tests and IV fluid. After receiving the test results, Swan ordered additional tests and increased the IV fluids.

Over the next two days, Thomas was diagnosed with severe necrotizing pancreatitis, resulting in renal failure, adult respiratory distress syndrome, multiple infections, many surgical interventions, amputation of the fingers on his right hand, tracheotomy, splenectomy, partial pancreatectomy, enterocutaneous fistuals, acute myocardial infarction secondary to thrombosis, and multiple small bowel fistulas.

The Helms subsequently sued for medical malpractice and sought to introduce the opinions of two experts, Chris Yiantsou, M.D. and Myles Keroack, M.D., in support of their position. Swan (together with the Association) and Methodist filed motions to exclude the testimony of both experts as unreliable. They also filed motions for summary judgment claiming that the Helms did not have any expert testimony to prove breach or causation if the testimony of Yiantsou and Keroack was stricken. The trial court struck the expert witnesses and granted the summary judgments.

### STANDARD OF REVIEW

■ The trial court granted no-evidence summary judgments. We apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.—San Antonio 1998, pet. denied). We look at the evidence in the light most favorable to the respondent against whom the summary judgment was rendered, disregarding all contrary evidence and inferences. *Moore,* 981 S.W.2d at 269. A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

■ A trial court's exclusion of expert testimony is reviewed under an abuse of discretion standard. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995); *Ford Motor Co. v. Aguiniga,* 9 S.W.3d 252, 262 (Tex.App.—

San Antonio 1999, pet. denied). A trial court abuses its discretion in admitting an expert's testimony that lacks a reliable scientific basis. *Aguiniga*, 9 S.W.3d at 262. All expert testimony must be determined to be both reliable and relevant before it is admitted into evidence. *Id.* To assist a court in determining the reliability of expert testimony, the Texas Supreme Court in *Robinson* set forth the following factors to consider: (1) the extent to which the theory has been tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory. *Id.*

### DISCUSSION

■ The primary criticism both Dr. Yiantsou and Dr. Keroack leveled against the Methodist nurses was their failure to notify Swan of Thomas's persistent pain. In addition, Dr. Keroack criticized Swan for failing to suspect the possibility of pancreatitis at 5:00 p.m. and for failing to aggressively institute fluid resuscitation. Dr. Yiantsou and Dr. Keroack opine that the failure to institute aggressive fluid resuscitation therapy increased the severity of Thomas's complications.

The scientific article that Dr. Yiantsou and Dr. Keroack rely upon to support their opinions states that it is important to distinguish mild from severe pancreatitis as early as possible to maximize therapy and prevent or minimize organ dysfunction and local complications. With regard to fluid resuscitation, the article states, "An essential component of treatment of severe acute pancreatitis is correction of intravas-

cular volume loss. Fluid resuscitation helps prevent hypotension and renal insufficiency and may help in the protection of the microcirculation of the pancreas." With regard to the prevention of pancreatic necrosis, the article states, "Although helpful in counteracting shock and renal failure, aggressive fluid resuscitation alone may not be capable of preventing pancreatic necrosis."

Both experts agreed that some patients will develop severe pancreatitis no matter what is done for the patient. Dr. Keroack stated in his deposition that some patients are destined for severe necrotizing pancreatitis no matter how quickly they are diagnosed and no matter how aggressively they are treated. Dr. Keroack stated that it was within the realm of possibility that Thomas was one of the unlucky patients destined to develop severe necrotizing pancreatitis. Dr. Keroack stated that he could not say with medical certainty that Thomas would have been better with early diagnosis and fluids. Dr. Keroack could only state that Thomas had a better chance of getting better.

Dr. Yiantsou stated in his deposition that early hydration would have altered Thomas's course with a reasonable degree of medical probability. Dr. Yiantsou stated that Thomas had a sixty to seventy percent chance of responding. However, Dr. Yiantsou also stated that he did not know if fluids would have helped Thomas; however, by not providing the hydration earlier, Thomas was deprived of the chance that his pancreatitis would be limited to simple interstitial pancreatitis as opposed to severe necrotizing pancreatitis. Dr. Yiantsou agreed that if the pancreatitis is diagnosed within 1–2 hours after the ERCP, there is no way to predict which patients will do well and which patients will develop serious necrotizing pancreatitis like Thomas. Dr. Yiantsou also agreed

that some patients will develop necrotizing pancreatitis regardless of how early the pancreatitis is diagnosed and regardless of how early fluid resuscitation is started. Dr. Yiantsou concluded that hydration is all there is to offer a patient who develops pancreatitis, and although there is no way to know if it would have worked for Thomas, he was deprived of his only chance.

■ In *Kramer v. Lewisville Memorial Hospital*, 858 S.W.2d 397 (Tex.1993), the Texas Supreme Court held that Texas does not recognize a common law cause of action for lost chance of survival in a medical malpractice case. There is no liability for negligent medical treatment "that decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse result probably would have occurred anyway." *Id.* at 398. Even if this court disagrees with the holding in *Kramer,* we are bound to follow it.

In an effort to avoid the holding in *Kramer* and to detract from their references to the loss of chance in their depositions, Dr. Yiantsou and Dr. Keroack filed supplemental affidavits stating:

> Thus, it is not my opinion or testimony that the lack of proper treatment merely increased the probability of something which was "likely to happen anyway," or that it merely deprived Mr. Helm of "a chance" to avoid complications that were already probably. On the contrary, given proper therapy, Mr. Helm's complications were statistically unlikely to occur. If he had received aggressive fluid therapy early on—rather than hours after he was already obviously hypovolemic—in reasonable medical probability he would have done much better. (Dr. Yiantsou) It is not my opinion or testimony that the lack of proper treatment merely increased the probability of something which was "likely to happen anyway," or that it merely deprived Mr. Helm of "a

> chance" to avoid complications that were already probably. On the contrary, given proper therapy, Mr. Helm's complications were statistically unlikely to occur. If he had received timely, aggressive fluid therapy in reasonable medical probability he would have done much better (Dr. Keroack)

Nothing in the medical literature, however, supports this opinion. The medical literature supports, and all of the experts agree, that fluid resuscitation is a support measure that should be given to patients with pancreatitis. However, no medical literature supports the opinion that an eight or thirteen hour delay in giving fluid therapy prevents or lessens the complications of severe necrotizing pancreatitis. Therefore, the theory developed by Dr. Yiantsou and Dr. Keroack has: (1) not been tested; (2) relies upon the subjective interpretation of the experts; (3) has not been subjected to peer review and/or publication; (4) has an unknown potential rate of error; and (5) has not been generally accepted as valid by the relevant scientific community. Although non-judicial uses have been made of the theory, since all patients are given the support measure when pancreatitis is diagnosed, there is no support for the timing issue which is critical to the experts' liability theory.

In addition, neither Dr. Yiantsou nor Dr. Keroack are able to exclude the possibility that even with prompt fluid resuscitation, Thomas would have suffered the same complications. *See Robinson,* 923 S.W.2d at 559 (plaintiff must rule out other possible causes with reasonable certainty); *Weiss v. Mechanical Associated Servs.,* 989 S.W.2d 120, 125–26 (Tex.App.—San Antonio 1999, pet. denied) (same). Without proof that Thomas was not one of the unlucky patients destined to develop severe necrotizing pancreatitis no matter what was done, the experts were unable to

rule out the possibility that the nature of Thomas's illness following the surgical procedure caused the complications to develop independent of any inaction by Swan and the nurses. Without testimony to rule out Thomas's illness following the surgical procedure as a possible cause, the experts' testimony that the complications were caused by the delay in fluid resuscitation is mere speculation.

### CONCLUSION

This case illustrates the harshness of the rule that has developed in Texas restricting expert testimony. Based on their clinical experience and practice, two qualified experts testified that the standard of care was breached by the failure to provide prompt fluid resuscitation. This is not junk science. There is no dispute among the experts and medical literature that prompt fluid resuscitation is the best chance to avoid necrotizing pancreatitis. However, because no medical professional would intentionally delay providing the fluid therapy, there are no studies regarding the effect of the delay. For this reason, Thomas can only prove that he lost the only opportunity he had to avoid complications-a loss the Texas Supreme Court is unwilling to recognize as having value. *Kramer*, 858 S.W.2d at 404–407.

Based on existing precedent, the trial judge did not abuse its discretion in excluding the experts' testimony, and the trial court's judgments are affirmed.